IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| In re: | ) | |
|---|---|---|
| | ) | |
| CHARLESTON ASSOCIATES, LLC, | ) | Chapter 11 |
| | ) | Case No. 10-_____ (___) |
| Debtor. | ) | |
| | ) | |
| | ) | |
| | ) | |

## DECLARATION OF MARTIN H. WALRATH IV, PRESIDENT OF BOCA FASHION VILLAGE SYNDICATIONS GROUP MM, INC., MANAGER OF CHARLESTON ASSOCIATES, LLC IN SUPPORT OF FIRST DAY PLEADINGS

I, Martin Walrath, hereby declare under penalty of perjury:

1. I am over the age of 18 and am competent to testify. I am the President of Boca Fashion Village Syndications Group MM, LLC, Manager of Charleston Associates, LLC ("Charleston" or "Debtor"). I have served in this role since 2004. In this capacity, I am generally familiar with the Debtor's day-to-day operations, business affairs, books and records.

2. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge of the Debtor's operations and finances, information learned from my review of relevant documents and information supplied to me by other members of the Debtor's management and the Debtor's advisors. I am authorized to submit this Declaration on behalf of the Debtor, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

3. On the date hereof (the "Petition Date"), the Debtor commenced its bankruptcy case ("Chapter 11 Case") by filing a voluntary petition for relief under chapter 11 of the bankruptcy code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"). No creditors' committee has yet been appointed in the Chapter 11 Case by the United States Trustee. The Debtor is

continuing in possession of its property and is operating its business, as debtor-in-possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

4. To minimize the adverse effects of filing for bankruptcy protection on its business, the Debtor has requested various types of "first-day" relief (collectively, the "First Day Motions"). The First Day Motions seek relief intended to allow the Debtor to perform and meet those obligations necessary to fulfill its duties as debtors-in-possession. I am familiar with the contents of each First Day Motion (including the exhibits thereto), and believe that the relief sought in each First Day Motion: (a) is necessary to enable the Debtor to operate in chapter 11 with minimal disruption or loss of productivity or value, (b) constitutes a critical element in achieving a successful reorganization of the Debtor, and (c) best serves the Debtor's estate and creditor's interests.

5. I am authorized to submit this Declaration in support of the Debtor's petitions for relief under the Bankruptcy Code and the First Day Motions. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, information supplied to me by other members of the Debtor's management and professionals, or learned from my review of relevant documents or upon my opinion based upon my experience with and knowledge of the Debtor's operations and financial condition. If called, I could and would testify competently to the facts set forth herein.

## Introduction

A. **The Debtor's Business.**

6. Charleston,[1] the successor by merger to Boca Fashion Village Syndications Group, LLC, is a limited liability corporation that owns a portion of a community shopping

---

[1] For all purposes herein, and without regard to the date of the merger, we refer to the Debtor as Charleston.

center located in Las Vegas, Nevada. Charleston's property consists of 20.4 acres located at 700-750 S. Rampart Boulevard and is known as Boca Fashion Village ("BFV" or the "Shopping Center"). BFV is a portion of a larger shopping center known as the Shops at Boca Park that encompasses almost 55 acres at the northeast corner of the intersection of Charleston Boulevard and Rampart Boulevard. The balance of the 55 acre site is owned by a non-debtor affiliate of Charleston. Charleston's property consists of three in-line buildings containing 138,869 square feet of rentable area and a 3.74 acre site that is subject to a long-term ground lease.

7. Approximately, 118,258 square feet or 85.2% of rentable area in BFV is currently leased. In addition, there is a cellular tower located on the property that is currently leased to Nextel. Among the companies that currently lease space and conduct retail or restaurant operations at BVF are such "national tenants" as REI, Total Wine and More, Cheesecake Factory, Harry & David, Ultra Diamonds, and Gordon Biersch.

8. The property upon which the Shopping Center conducts its operations is subject to a Deed of Trust and Absolute Assignment of Rents and Leases and Security Agreement (and Fixture Filing) dated as of December 23, 2004 ("Deed of Trust"). The Deed of Trust secures a Promissory Note Secured by Deed of Trust ("Promissory Note"), dated as of December 23, 2004, in the original principal amount of $58 million. The Promissory Note and Deed of Trust are "securitized" and the "technical" beneficiary of the Deed of Trust is Mortgage Electronic Registration Systems, Inc., a Delaware corporation ("MERS" or "Beneficiary"). The trustor of the Deed of Trust is Boca Fashion Village, LLC, the predecessor by merger of Charleston.

B. **Economic Performance and Other Challenges**

9. The Shopping Center has been significantly hurt by the current and prolonged economic recession and is struggling to maintain its tenant base. Within the past 24 months, the

Shopping Center has lost two large "anchor tenants," The Great Indoors and Linens 'n Things, as well as tenants occupy an additional 13,830 square feet of rented inline space.

10. Linens 'n Things filed its own bankruptcy case in November, 2008, rejected its lease, ceased paying rent, and vacated approximately 30,000 square feet of inline space.

11. The Great Indoors is a retail home furnishing and design chain operated by a subsidiary of Sears. Until December of 2008, the Great Indoors was one of the anchor tenants at the Shopping Center, occupying a stand-alone building located on a 3.7 acre portion of the Property comprising some 161,172 square feet of land. In December, 2008, The Great Indoors closed four of its sixteen stores, including the store at BFV. The building that previously housed The Great Indoors ("Vacant Building") has been dark and empty for over seventeen months.

12. While Sears continues to pay the monthly rental called for under The Great Indoors Ground Lease, the closure of the store has caused a sharp reduction in Shopping Center "traffic," with a resulting reduction in revenue earned and "percentage rent" paid by other Shopping Center tenants, and has made it more difficult for Charleston to lease other vacant space at the Shopping Center.

13. Charleston has been working diligently to overcome the challenges presented by recent international economic events to commercial real estate and retail businesses throughout the country, with some success. However, the closure of Linens 'n Things and The Great Indoors, and other factors, have caused a drastic reduction in Shopping Center "traffic." As a result, even though 85.2% of the rentable area is currently leased, there has been a significant reduction in revenue earned and "percentage rent" paid by other Shopping Center tenants.

C. **Efforts to Secure New Tenants**

14. In late 2008, REI opened a store in the Shopping Center. In early 2009, Charleston negotiated significant leases to Total Wine and Grimaldi's Pizza. Although

Charleston was able to negotiate these important leases, the cost of securing these national tenants in tenant improvements was very expensive and exceeded the limitations provided for tenant improvements in the Loan Agreements.

15. Since April, 2009, Charleston has requested the release of certain holdback funds from the Beneficiary so that it could pay the tenant improvement allowance owed to REI pursuant to its lease. Charleston has also requested certain other waivers and concessions that would allow it to pay its outstanding tenant improvement obligations. Each of Charleston's requests was denied, with the exception of a request for a partial disbursement to REI of the holdback from the general tenant improvement reserve, which was otherwise permitted under the loan documents. This disbursement covered only about one-third of the amount owed to REI. Since June 2009, REI has offset its rent payment towards the balance of the TI owed.

16. Without the funds to complete tenant improvements for REI, Total Wine and Grimaldi's Pizza, Charleston faced the risk the loss of approximately 58,532 square feet of otherwise leased space. Hence, Charleston was compelled to apply revenues to tenant improvements with a resultant decrease in operating capital and interest reserves.

17. Beginning in late 2009, as a result of the loss of tenants, decrease in rent from existing tenants and increase in tenant obligations, Charleston was no longer able to make payments of principal and interest on its loan. Instead, Charleston applied all revenue to reasonable and necessary property expenses, and to required tenant improvements for its new tenants.

18. Fry's Electronics, Incorporated ("Fry's) is a retailer of software, consumer electronics, computer hardware and household appliances which, in addition to its online business, operates some 34 big-box stores in nine states.

19. On or about January 29, 2010, an affiliate of Fry's made an offer of $5 million to Charleston for the purchase of the Vacant Structure. The offer was contingent upon the purchaser's ability to "purchase" the lease to The Great Indoors. If it is successful in purchasing the Vacant Building, the purchaser will open a Fry's store on the site. It is unwilling to accept a sublease of the Vacant Building.

20. The presence of an operating Fry's store on the Property will greatly enhance the value of the Shopping Center by increasing Shopping Center traffic, promoting sales by Shopping Center tenants, and enhancing the ability of Charleston to attract new tenants.

21. The sale of the Vacant Building to Fry's affiliate will, however, require the release of a portion of the Lenders' collateral. In return for this partial release, the Lenders will receive all of the $5 million proceeds of the Fry's transaction. To date, despite repeated requests by Charleston, and despite repeated statements that they are preliminarily inclined to approve the transaction, the Lenders' have failed and refused to allow Charleston to conclude the Fry's sale transaction. Needless to say, the Lenders' delay puts this transaction in jeopardy.

22. Charleston has attempted to negotiate a consensual restructuring of its debt to the Beneficiary for over twelve months. The Beneficiary has ignored or rejected each and every proposal made by Charleston.

**D.**    **Need for Relief.**

23. In light of the foregoing factors, Charleston has determined that Chapter 11 is the best and most efficient way to preserve, enhance and realize the going-concern value of its assets.

## First Day Motions

24. To minimize the adverse effects of the Chapter 11 Case on its business, the Debtor has requested various types of relief in the First Day Motions, which have been filed

concurrently with this Affidavit. For the reasons discussed herein, the Debtor believes that the relief requested in the First Day Motions is necessary and appropriate and in the best interest of the Debtor's estate, creditors and other parties in interest.

A. **Motion of Debtor for Entry of an Order Authorizing Continued Use of Existing Bank Accounts, Cash Management System and Checks and Business Forms.**

25. The Debtor uses its bank accounts in the ordinary course of business to enable it to manage its cash (the "Cash Management System") and to meet its obligations in a timely and efficient manner.

26. The Debtor currently maintains two bank accounts. There is a bank account in the name of Boca Fashion Village, LLC, the predecessor by merger of the Debtor (the "BFV Account"). Until June 1, 2010, the BFV Account was the Debtor's primary account. After the merger of BFV into Charleston, the Debtor opened a second bank account in the name of the Charleston Associates, LLC (the "Master Account"). Both accounts are held at Wells Fargo Bank, NA ("Wells Fargo").[2] As of June 1, 2010, all tenants of the Shopping Center were directed to make rents payable to Charleston, and all rents were deposited into the Master Account. The Master Account facilitates the collection, concentration, management and disbursement of funds. The Master Account is the account into which all deposits flow and out of which all cash expenditures are made. The Debtor also maintains a system designed to accurately record such collections, transfers and disbursements as they are made (the "Cash Management System").

27. The Debtor's Cash Management System is similar to those commonly employed by corporate entities of comparable size and complexity. The continued use of the Debtor's Cash Management System allows for, among other things, the Shopping Center's tenants to

---

[2] There were two prior bank accounts, also held at Wells Fargo, that were closed in 2008 and 2009.

continue to deposit rents without interruption, the efficient tracking and control of funds, and the reduction of administrative costs. Moreover, Wells Fargo is intimately familiar with the Debtor's systems, which will facilitate the transition into Chapter 11, and is an approved bank in accordance with § 345 of the Bankruptcy Code.

28. The continued use of existing correspondence and other business forms, in particular those relating to the bank accounts, will avoid adverse effects to the Debtors' operations, which would be anticipated were the Debtor's required to suspend business functions pending transition to new forms. To minimize disruption and expense to the estate, the Debtor requests authority to continue to use existing stock of forms including, but not limited to, checks, letter head, purchase orders and invoices, as such forms were in existence immediately prior to the Petition Date. Upon depletion of the Debtor's business forms, the Debtor's new forms will reflect its status as debtor-in-possession. Parties doing business with the Debtor will be aware of the Debtor's status as debtor-in-possession and changing business forms already in existence would, thus, be unnecessarily burdensome and expensive.

29. The Debtor submits that the relief requested herein is necessary and appropriate, is in the best interests of the estates and creditors, and should be granted by this Court.

**B. Motion of the Debtor for Entry of an Order Determining Adequate Assurance of Payment of Future Utility Services.**

30. In the ordinary course of its business, the Debtor incurs utility expenses for water, sewer service, electricity, natural gas and other services. On average, the Debtor spends approximately $20,000 each month on utility costs. Debtor has been paying all of its utility bills, in the ordinary course, pursuant to the usual and customary terms of payment established generally by those utilities.

31. To provide additional assurance of payment for future services to the Utility Providers, the Debtor will maintain a minimum balance of $10,000, which is equal to approximately two weeks of the Debtor's estimated monthly cost of utility service.

32. If a Utility Provider is not satisfied that the minimum balance provides adequate assurance of future payment, the Debtor proposes a set of procedures in the Motion under which the Utility Provider may make additional requests for adequate assurance.

33. The Debtor believes that uninterrupted utility services are essential to the Debtor's ongoing operations and, therefore, to the success of this Chapter 11 Case. Simply put, the Debtor believes that, without utility services, the Shopping Center will shut down.

C. **Motion of the Debtor Pursuant to Sections 105(a), 361, and 363 of the Bankruptcy Code for Entry of an Order Authorizing the Use of Cash Collateral and Scheduling a Final Hearing.**

34. In the normal course of business, Debtor uses cash on hand and cash flow from rents to fund the operating expenses of the Shopping Center. An inability to use these funds during the chapter 11 case could cripple the Debtor's business operations. Indeed, Debtor must use its cash to, among other things, continue the operational of its business in an orderly manner, maintain business relationships with vendors, suppliers and tenants, and satisfy other operation needs – all of which are necessary to preserve and maintain the Debtor's going concern value and, ultimately, effectuate a successful reorganization.

35. The Debtor continues to generate revenue from rents and operations and has approximately $194,667 in available cash as of the Petition Date. The Debtor will continue to replenish its funds with incoming rents which alleviates the need for additional funding – debtor in possession financing or otherwise.

36. Without use of the Cash Collateral, the Debtor will have no ability to maintain the operation of the Shopping Center. The Debtor will not be able to pay its vendors and its vendors will likely cease to provide goods and services to the Debtor on credit. The Debtor will not be able to service its tenants, maintain the Shopping Center and continue operations. All of these outcomes will cause immediate and irreparable harm to the Debtor's estate. The Debtor, therefore, seeks immediate authority to use the Cash Collateral, as set forth in this motion and in the Interim Order, to prevent immediate and irreparable harm to the Debtor's estate pending the Final Hearing pursuant to Bankruptcy Rule 4001(c).

37. The Debtor therefore seeks this Court's approval to use Cash Collateral solely to pay ordinary business and operational expenses and limited administrative costs for a period of 45 days through July 31, 2010, as set forth in the budget attached as Exhibit 1 to the Interim Order.[3]

## TERMS OF THE USE OF CASH COLLATERAL

38. In accordance with Bankruptcy Rule 4001(b), the principal terms of the Cash Collateral Order include the following:

(i) As stated above, in addition to the Debtor, the Beneficiary may have an interest in the Cash Collateral.

(ii) The Cash Collateral is proposed to be used to pay ordinary business and operational expenses and limited administrative costs as set forth in Exhibit 1.

(iii) The use of cash collateral would be for the 45 day period ending July 31, 2010.

(ii) The Beneficiary is adequately protected because the Debtor will be using incoming rents as Cash Collateral to pay ordinary business expenses in order to maintain the operations and value of the Shopping Center.

---

[3] Debtor will attempt to negotiate a consensual use of Cash Collateral for the period beginning August 1, 2010 with the Beneficiary prior to the expiration of the 45 day period, and will file a separate motion seeking approval of the use of additional Cash Collateral at that time.

(iii) Moreover, based upon the circumstances in this case, the use of cash collateral is warranted to preserve the assets of the estate.

## PROPOSED USE OF CASH COLLATERAL

39. The Debtor respectfully requests the use of Cash Collateral to carry on the operation of its business during the pending of this Chapter 11 case. To operate in chapter 11 in a manner consistent with its ordinary course practice, Debtor must have access to cash. Cash collateral will be used to make payments to vendors and to satisfy the other ordinary costs of operation, all in accordance with the Budget attached to the Interim Order. Allowing the Debtor to use Cash Collateral will minimize the damage caused by this Chapter 11 case and will enable the Debtor to avoid any disruption to the Shopping Center, or damage confidence of the vendors and tenants, that might otherwise arise from nonpayment of operational expenses which arise in the ordinary course of the Debtor's business, even for a limited period of time, would not be possible, and serious and irreparable harm to the Debtor and its estate would occur. The use of Cash Collateral is therefore critical to preserve and maintain the going concern value of the Debtor for the benefit of all stakeholders.

40. Absent authorization from the Court to use Cash Collateral on an interim basis pending a Final Hearing, the Debtor will be immediately and irreparably harmed. As set forth above, the Debtor's ability to use Cash Collateral on the terms described herein is critical to its ability to operate its business in the ordinary course. Without the liquidity provided by the use of Cash Collateral, the Debtor's business will be brought to an immediate halt. In addition, the Debtor's ability to maintain business relationships with its vendors, suppliers and tenants and to meet other operating expenses will be comprised without the use of Cash Collateral. Serious and irreparable harm to the Debtor and its estate would occur, with disastrous consequences for the Debtor, its estate, and creditors of the Debtors.

D. **Motion of the Debtor for Entry of an Administrative Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals and Official Committee Members.**

41. The Debtor seeks to establish an orderly, regular process for the allowance and payment of compensation and reimbursement for attorneys and other professionals whose payment of retention are approved by this Court to streamline the administration of these Chapter 11 Cases.

42. The proposed compensation procedures require that on or before the 25th day of each month following the month for which compensation is sought, each Professional seeking compensation serve a monthly statement (the "Monthly Fee Application") with the Court and serve the Monthly Fee Application on (1) co-counsel to the Debtor, Butler Rubin Saltarelli & Boyd LLP, 70 W. Madison, Suite 1800, Chicago, Illinois 60602, Attn: Neal Wolf, Esquire; (2) co-counsel to the Debtor, Pachulski Stang Ziehl & Jones LLP, 919 N. Market Street, 17th Floor, Wilmington, DE 19801, Attn: Bradford J. Sandler, Esquire; (3) counsel to any Official Committee of Unsecured Creditors appointed in this Chapter 11 Case; and (4) the Office of the United States Trustee for the District of Delaware (collectively, the "Notice Parties").

43. The Notice Parties will have until the 20th day following service of the Monthly Fee Application to object to the requested fees and expenses. After the 20th day has passed, the Debtor is authorized and directed to pay the Professionals 80% of the fees and 100% of the expenses requested and that are not subject to objection. Professionals whose fees are subject to objection may request payment of their fees from the Court.

44. The Debtor believes that the efficient administration of the Chapter 11 Case will be significantly aided by establishing the Compensation Procedures described in the Motion.

Accordingly, the relief requested in the Motion is in the best interests of the Debtor's estate, creditors and all parties in interest.

### E. Application by the Debtor for Entry of an Order Authorizing the Employment and Retention of Butler Rubin Saltarelli & Boyd LLP as Counsel to the Debtor Nunc Pro Tunc to the Petition Date.

45. The Debtor seeks to retain Butler Rubin Saltarelli & Boyd LLP as its attorneys because Butler Rubin has extensive expertise, experience and knowledge in the field of debtors' and creditors' rights and business reorganization under the Bankruptcy Code, as well as other areas of law where the Debtor may need legal advice. Butler Rubin also possesses extensive experience in practicing before this Court and other bankruptcy courts.

Butler Rubin has been actively involved in major chapter 11 bankruptcy cases throughout the United States, and also cases more modest in size. In addition, Butler Rubin represents or has represented debtors as co-counsel, conflicts counsel or special counsel in a number of cases. For the foregoing reasons, the Debtor believes that Butler Rubin is both well qualified and able to represent it in the Chapter 11 Case in an efficient and timely manner.

46. The Debtor believes that Butler Rubin's employment is necessary and in the best interests of the Debtor and its estate.

### F. Retention by the Debtor for Entry of an Order Authorizing the Retention and Employment of Pachulski Stang Ziehl & Jones LLP as Co-Counsel to the Debtor Nunc Pro Tunc to the Petition Date.

47. The Debtor seeks authorization to employ and retain Pachulski Stang to represent it as its co-counsel in connection with the filing and prosecution of the Chapter 11 Case and all matters related thereto. Pachulski Stang's retention will reduce the overall expense of administering the Chapter 11 Case. Moreover, pursuant to Local Rule 9010-1(c), the Debtor is required to retain Delaware Counsel. Butler Rubin and Pachulski Stang have discussed a

division of responsibilities regarding the Debtor's representation in the Chapter 11 Case and will make every effort to avoid and/or minimize duplication of services.

48. In light thereof, the Debtor believes that the retention of Pachulski Stang is in the best interest of the Debtor, its creditors and the other parties in interest.

*[The remainder of this page has been intentionally left blank.]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 16, 2010          By: /s/ Martin H. Walrath

Martin H. Walrath
President, Boca Fashion Village Syndications
Group MM, LLC, Manager of Charleston
Associates, LLC

462291v1